AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

**FILED**

# UNITED STATES DISTRICT COURT

### for the

### Western District of Oklahoma



5:22 pm, Mar 23, 2023
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
By: Ryan Beam, Deputy Clerk

|  |  |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>IN THE MATTER OF THE SEARCH OF FACEBOOK USER ID<br>100040201699878 THAT IS STORED AT PREMISES OWNED,<br>MAINTAINED, CONTROLLED, OR OPERATED BY META PLATFORMS,<br>INC., A COMPANY HEADQUARTERED IN MENLO PARK, CALIFORNIA | )<br>)<br>)<br>)  Case No.  MJ-23- *186* -AMG<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is incorporated by reference herein.

located in the _____ **Western** _____ District of _____ **Oklahoma** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |

The application is based on these facts:

See attached Affidavit, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

RYAN BELCHER, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **3/23/23**
_____

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

AMANDA MAXFIELD GREEN, U.S. Magistrate Judge
*Printed name and title*

AUSA: Chelsie A. Pratt

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

IN THE MATTER OF THE SEARCH OF
FACEBOOK USER ID 100040201699878
THAT IS STORED AT PREMISES
OWNED, MAINTAINED, CONTROLLED,
OR OPERATED BY META PLATFORMS,
INC., A COMPANY HEADQUARTERED
IN MENLO PARK, CALIFORNIA

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A WARRANT TO
## SEARCH AND SEIZE

I, Ryan Belcher, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with the Facebook account containing the following user identification number - **100040201699878** (the **Target Account**) – an account which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in **Attachment A.** This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID **100040201699878.**

2. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since April 2015. I am presently assigned to the HSI office in

Oklahoma City, Oklahoma (hereinafter referred to as HSI Oklahoma City).  I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am authorized to conduct criminal investigations of violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      I have been involved in a wide variety of investigative matters. Among other responsibilities, I am responsible for conducting investigations into violations of federal criminal laws, including the manufacturing and possession of controlled substances with the intent to distribute.  I have received approximately 24 weeks of specialized training at the Federal Law Enforcement Training Center in the enforcement of federal laws.  I have arrested, interviewed, and debriefed numerous individuals who have been involved and have personal knowledge of transporting and concealing narcotics, as well as, the amassing, spending, converting, transporting, distributing, money laundering and concealing of proceeds from illegal drug trafficking and smuggling. I have participated in numerous investigations involving physical and electronic surveillance. I have testified in judicial proceedings concerning the prosecution for violations of laws related to the smuggling and trafficking of contraband, including controlled substances. I have been the affiant and participated on numerous federal search warrants.

4.      The facts in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and

2

statements made by witnesses and other concerned parties. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. § 846 (Drug Conspiracy) has been committed by Sammy FOSTER (FOSTER), who is the user of the **Target Account**, and others. There is also probable cause to search the information described in **Attachment A** for evidence of these crimes, as described in **Attachment B**.

## PROBABLE CAUSE

6.      Homeland Security Investigations (HSI), the Oklahoma Bureau of Narcotics (OBN), and the Lawton Police Department (LPD) are conducting a joint investigation targeting Isaiah Clinton McGill (MCGILL), a cocaine distributor who operates primarily out of Lawton, Oklahoma but has distribution activities that extend through at least Oklahoma City, Oklahoma and likely up to Missouri. The investigation began in mid-2021, and through the use of a Title III wiretap investigation, cooperating defendants, undercover agents (UC), pole cameras, controlled purchases, Facebook search warrants, pen registers with trap and trace capabilities, ping warrants, GPS trackers on automobiles, and subpoenas for financial documents, agents confirmed that MCGILL distributed cocaine. From January 2022 through November 2022, HSI and OBN conducted nine (9) controlled purchases of cocaine from MCGILL primarily at the

businesses he owned throughout Lawton, Oklahoma (BLVD smoke shops and the Dragon West topless nightclub).

7.      In June of 2019, FOSTER was released from prison and placed on supervised release by the United States Probation office. While on probation, FOSTER reported to his U.S. Probation Officer that he began working at the BLVD Smoke Shop in May of 2020. The BLVD Smoke Shop was a business owned and operated by MCGILL. This verifies that FOSTER had a relationship with MCGILL dating back to at least 2020.

8.      During this investigation, an undercover agent (UC) conducted multiple controlled buys of cocaine from MCGILL at the BLVD Smoke Shop where FOSTER worked. The first of those controlled buys was conducted on or about March 15, 2022. The second controlled buy was conducted on March 31, 2022. The third controlled buy was conducted on April 21, 2022. During the same time frame, FOSTER was reporting to U.S. Probation that he was employed there. Furthermore, three additional controlled buys by the UC took place at the Dragon West nightclub, another business owned and operated by MCGILL. FOSTER was regularly observed by law enforcement around this business as well.

9.      In December of 2021, LPD obtained an Oklahoma state warrant for records related to Facebook ID 100000907433857. This Facebook account was identified by law enforcement as a Facebook account used by MCGILL. Records received by LPD from Meta showed numerous communications between Facebook ID 100000907433857 (MCGILL) and Facebook ID **100040201699878 (the Target Account)**. The records

4

received by LPD documented activity for MCGILL'S Facebook account between June 19, 2021, and November 19, 2021. In the "Friends" section of the records, Facebook ID **100040201699878** (the **Target Account**) lists the name "Sammy Foster" as the name associated with the account. The first communication between the two Facebook accounts took place on June 21, 2021, only two days after the beginning date of requested records, and continued regularly throughout the time period of the requested records.

10. On November 7, 2022, Homeland Security Investigations (HSI) presented and was later granted, through United States District Judge for the Western District of Oklahoma Bernard Jones, an order authorizing the interception of wire communications for (580) 678-4101 (TT1). Through this investigation, to include controlled purchases of trafficking amounts of cocaine, HSI knows phone number (580) 678-4101 to be used by MCGILL.

11. During this investigation, it was discovered that FOSTER was a co-conspirator in trafficking cocaine and other illegal substances for MCGILL and other subjects not known to law enforcement. Furthermore, law enforcement confirmed phone number (580) 458-2200 was subscribed to MGILL but used by FOSTER. Throughout the interception of the (580) 678-4101, FOSTER was regularly intercepted using (580) 458-2200.

12. On November 12, 2022, while monitoring TT1, a phone call intercepted between FOSTER and MCGILL provided details about a trip FOSTER was taking to transport suspected THC vape cartridges and cocaine. Investigators later discovered that FOSTER traveled to Missouri. During the call, MCGILL reminds FOSTER about "that

other thing," which he needed to deliver with the "vapes." FOSTER expressed concern to MCGILL how he [FOSTER] almost forgot "that other thing" and it was the only item the recipient really wanted, and the guy was just taking the vapes. FOSTER added that he would "have the whole thousand (1,000) done today." Later that same day, investigators observed MCGILL arrive at FOSTER'S residence carrying a black bag as he walked inside FOSTER'S residence. Through knowledge and experience, I believe the reference to "that other thing" was code for cocaine, and "vapes" is referencing THC (marijuana) vape cartridges. I believe MCGILL delivered cocaine to FOSTER, and the cocaine was the item FOSTER almost forgot to take to Missouri.

13.     On November 13, 2022, phone calls that were intercepted on TT1 that detailed the events of FOSTER'S trip to Missouri. During the trip, FOSTER got a flat tire and called to inform MCGILL. FOSTER expressed concern about items stored in the trunk of his car and being on federal probation. These items were believed to be the cocaine and THC vape cartridges referenced the previous day. During the call, FOSTER was worried about encountering the police while fixing his tire and the police requesting a search of his car. In a later call, FOSTER told MCGILL how a highway patrolman [OHP Trooper] encountered him while changing his tire. FOSTER told MCGILL, "all that shit was on the back seat of my car bro," referring to the items he previously concealed in the trunk. FOSTER detailed how he was worried when the Trooper looked in his vehicle and saw the items in his back seat.

14.    Later that same date, FOSTER called MCGILL to arrange a drug deal. FOSTER stated, "Hey bro, Hippie [PH] wants to come see you... for a ball." FOSTER presented details for "Hippie" to travel from Norman, OK to Lawton, OK to meet MCGILL. MCGILL acknowledged and agreed to meet "Hippie." Based on my training and experience, I know the term "ball" is short for "8 ball," which is slang commonly used when referring to eight ounces of cocaine.

15.    On November 14, 2022, at approximately 1110 hours, MCGILL received an incoming voice call from FOSTER (Ref. Session 0592). MCGILL asked FOSTER if he was back in town, referring to Lawton, Oklahoma. FOSTER advised MCGILL that he would return to town at approximately 4:30pm. FOSTER tells MCGILL, "Well, I'm uh... bringing you back sixty (60)." MCGILL responds, "Okay, bud." FOSTER continues, "And uh, I'm supposed to bring a lot more back... this weekend when I come back from Kentucky. I'm just gonna deliver them, bro."

16.    Later that same date, at approximately 1719 hours, investigators observed MCGILL arrive at FOSTER'S residence (2101 SW 38th St. Lot 90) and exit his 2022 silver Chevrolet Silverado (MLA680) only carrying his cellular phone in his hand. Shortly thereafter, at approximately 1729 hours, investigators observed MCGILL exit FOSTER'S residence with what appeared to be a backpack. MCGILL entered his Chevrolet Silverado and departed the area.

17.    Later that same date, at approximately 1925 hours, MCGILL received an incoming voice call on TT1 from an unknown male subject through phone number (816)

7

205-1751 (hereinafter UM1751) (Ref. Session 1592). MCGILL and UM1751 begin the conversation about how everything is going. UM1751 tells MCGILL, "Sam [FOSTER] got a backpack full of money you need to go get, though. As soon as you can." MCGILL responds to UM1751, "Yeah, yeah. Yeah, I already got it," and confirmed that FOSTER already gave it to MCGILL.

18.    UM1751 asked MCGILL "Alright, alright. Where we at on the money? Is that-where, where is that?" UM1751 added, "You took the sixty (60) off of the one fifty-five (155) that and we still got some of that, right? UM1751 continued and asked MCGILL, how much money they were totaling right now. MCGILL replied, "So, you just brought-he just gave me sixty (60), right?" referencing the "60" FOSTER gave him earlier that day. The two men continue the conversation about business issues they are both involved in.

19.    Through this investigation and observations made during these communications, investigators believe the numbers "60" and "155" are referencing sixty thousand dollars ($60,000), one hundred and fifty-five thousand dollars ($155,000). With MCGILL and FOSTER known to traffic cocaine, it is suspected that this money was in exchange for cocaine and other illegal items, such as marijuana and related marijuana products.

20.    On November 18, 2022, calls intercepted on TT1 between MCGILL & FOSTER verified FOSTER was traveling thru Missouri. In session 3422, FOSTER tells MCGILL he was involved in a traffic stop conducted by Missouri Highway Patrol and he

[FOSTER] refused a consensual search of his car.   During the call, FOSTER tells MCGILL that he [FOSTER] told the Trooper he was traveling to Bowling Green. FOSTER and MCGILL discuss taking an alternate route when he returned to Oklahoma and that he [FOSTER] would be returning with cash.  Later that same evening, in session 3485, FOSTER tells MCGILL he attempted to contact someone they know who lives in Branson, Missouri.  FOSTER goes on to explain the reason for that call was to create a false story to provide to his Probation Officer to legitimize a reason to be in Missouri, which was a violation of his probation.

21.   On November 19, 2022, FOSTER calls MCGILL (Ref. Session 03820) and tells MCGILL he [FOSTER] needs to know what it goes for a pound.  MCGILL tells FOSTER that if they sell it for $5 a gram, then the price comes out to be $2,200.  The two men go on to discuss how the price can depend on the situation.  They discuss how selling for too low of a price keeps them from making profit, but if they sell for too high of a price, then potential customers may not want to purchase from them.  Considering the nature of this call, the amount of product detailed, and the price, investigators believe the two men are referring to a marijuana by-product such as cannabis wax.

22.   Later that same date, at approximately 2353 hours, MCGILL and FOSTER speak again.   During that call, FOSTER tells MCGILL he is in Nashville and won't be leaving until the next day.  FOSTER also states, "I had to go and pickup some more cash and [U/I]."

23.    On November 20, 2022, at approximately 1128 hours, FOSTER calls MCGILL (Ref. Session 4004). During that call, FOSTER tells MCGILL he met someone the previous night who wanted to buy marijuana from him. FOSTER continues the conversation explaining to MCGILL how this person is involved in marijuana and "ice." Through training & experience, investigators know the term "ice" is a common slang term used when referring to crystal methamphetamine. FOSTER adds how this person will sell him one kilogram of "ice" for four thousand dollars ($4,000). FOSTER continues by telling MCGILL how this person won't work with anyone but family but since he [FOSTER] was brought there by someone, then he was considered family. This conversation illustrates how FOSTER is involved with at least one individual who is selling kilogram quantities of crystal methamphetamine.

24.    Later that same date, at approximately 1640 hours, FOSTER was traveling back to Lawton, OK and was stopped by a Roland Police Department (RPD) Officer in Roland, OK for a traffic violation. HSI has since received a copy of the report documenting the traffic stop from RPD. During the traffic stop, the RPD Officer identified FOSTER as the driver and lone occupant of the vehicle. During the traffic stop, the Officer asked FOSTER if he was concealing any drugs, firearms, or money in the vehicle. FOSTER denied having any of those items in the vehicle. FOSTER was issued a warning by the RPD Officer for the traffic violation. The Officer asked FOSTER if he would consent to a K-9 free air sniff of the vehicle. FOSTER agreed and consented to the K-9 deployment around the exterior of the vehicle. The RPD K-9 was

then deployed and conducted a free air sniff of the exterior of the vehicle. The K-9 alerted to the odor of illegal drugs coming from the vehicle. The Officer conducted a search of the vehicle and discovered a large sum of U.S. currency in a plastic bag, hidden in the trunk of the vehicle underneath the spare tire. The RPD later determined that the U.S. currency totaled $25,000.

25.    Based on my training and experience, I am aware that hiding large sums of currency in a vehicle is indicative of bulk cash smuggling. Bulk cash smuggling is commonly associated with the smuggling or distribution of illegal drugs. In this instance, FOSTER was driving from Kentucky to Oklahoma, with a large sum of cash, which was hidden beneath the spare tire, and wrapped in plastic. Taking all the facts into consideration, it is believed FOSTER was returning from Kentucky with the money to give to MCGILL resulting from a drug transaction. On the evening of November 20, 2022, calls intercepted on TT1 between MCGILL & FOSTER documented events of the arrest of FOSTER by RPD.

26.    These calls illustrate the level of involvement FOSTER had with MCGILL and others, known and unknown by law enforcement to possess and controlled substances illegally. Furthermore, the information provided in this affidavit reinforces how FOSTER was conspiring with MCGILL and others to distribute illegal drugs and has used or is using his home residence to store illegal drugs (cocaine and marijuana), as well as U.S. Currency (the proceeds from illegal drug sales), and other items of drug paraphernalia (such as cannabis wax and THC vape cartridges).

27.    Subsequent to the traffic stop of FOSTER, RPD seized his [FOSTER's] cell phone, an Apple iPhone 11, Model N104AP. RPD executed a state search warrant of FOSTER'S cell phone and extracted data from the cell phone. RPD provided HSI a copy of the cellphone extraction. The extraction of FOSTER'S cell phone revealed user account information for the Facebook and Facebook Messenger apps. That user account information revealed the Facebook ID for both apps as 100040201699878, the **Target Account.**

28.    While monitoring TTI on December 8, 2022, at approximately 1006 hours, investigators observed MCGILL receive a phone call from (580) 458-2200. There was no answer, and no voice message was left during this call. (580) 458-2200 was the primary phone number used by FOSTER for most phone calls involving him during the interception of TT1. The only phone calls intercepted where FOSTER did not use that phone number were when he was arrested by Roland PD and his phone was seized. Subsequent to that arrest, FOSTER continued to use that phone number, which was documented in additional phone calls during the interception of TT1.

29.    Later that same date, U.S. Probation officer(s) took FOSTER into custody for multiple violations of his federal probation at Western District of Oklahoma case number CR-19-287-G and discovered FOSTER had in his possession an Apple iPhone 13, model A2482, dark blue in color, bearing IMEI number 359673350157831. U.S. Probation secured this phone and later turned it over to HSI.

30.     On that same date, at approximately 1147 hours, MCGILL received a phone call from Dakota Foster, FOSTER'S son. Dakota Foster advised MCGILL that FOSTER had been arrested by his probation officer. Dakota Foster told MCGILL his dad called him from the courthouse and asked him to come get his keys, wallet and his car. Taking all the events of December 8, 2022, into consideration, investigators believe the cell phone FOSTER had in his possession when he was arrested by U.S. Probation officer(s) is the same phone that utilizes phone number (580) 458-2200.

31.     On January 12, 2023, a review of FOSTER'S jail calls revealed a phone call with a woman, using phone number (580) 360-8407, identified only as Jessica. During this phone call, FOSTER admitted to the woman he conspired with MCGILL, stating "I played a minor role" and stated he "can count all the times on one hand I did that." FOSTER told Jessica he wanted to turn his Facebook account off and stated he would provide her with his username and password so she could turn it off. Jessica agreed to do this for FOSTER and added that she would notify Facebook the account was fake. FOSTER affirmed and said that would work.

32.     On February 8, 2023, a federal search warrant was issued in the Western District of Oklahoma authorizing a search of FOSTER'S cell phone that was recovered by U.S. Probation on or about December 8, 2022. A search of that cell phone revealed user account information for the Facebook and Facebook Messenger apps. That user account information revealed the Facebook ID for both apps as 100040201699878, the **Target Account.**

13

33.     Based on my knowledge of this investigation, I believe FOSTER has been using Facebook to communicate for an extended period of time.  Given the volume of regular communications FOSTER had with MCGILL via Facebook since June of 2021, I believe FOSTER uses Facebook as a regular method to communicate with MCGILL. Based on my training and experience, criminals try and hide evidence of their crimes by using messaging apps with other co-conspirators.   Furthermore, Facebook and its messenger app are regularly discovered by law enforcement as a method of communication used by criminals involved in the distribution of drugs.

34.     Given the multiple controlled buys conducted at FOSTER's workplace, the BLVD Smoke Shop, starting on or about March 15, 2022, and his continued involved until the time of the seizure of his cell phones, your affiant is requesting records of his Facebook, as enumerated in Attachment B, from the time period of March 15, 2022, to December 15, 2022.

## TECHNICAL INFORMATION ABOUT META PLATFORMS, INC.

35.     Meta owns and operates Facebook, a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Meta allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

36.     Meta asks Facebook users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail

14

addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

37.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

38.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings,

Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

39. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post status updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming events, such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

40. Meta allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

41. Facebook users can exchange private messages on Facebook with other users using Facebook Messenger. Facebook users can also post comments on the

16

Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

42.     If a Facebook user does not want to interact with another user on Facebook, they can "block" the second user from seeing his or her account. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43.     Meta has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

46.     Facebook users can exchange private messages on Facebook Messenger with other users. These messages, which are like e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the

recipient, as well as other information. There is also a separate application, Facebook Messenger, where users can send and receive private and group messages. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep transactional records for each call.

47.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

48.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

49.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Meta can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group

Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

50.     Meta uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Meta applications.

51.     In addition to the applications described above, Meta also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

52.     Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

53.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service

(including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

54. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators

can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55.     Therefore, the computers and/or servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, other account information and prospective location information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

56.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in

Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review that information to locate the items described in Section II of **Attachment B**.

## AUTHORIZATION REQUEST

57.    Based on the foregoing, I request that the Court issue the proposed search warrant.

58.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute the warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

59.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

60.    I further request that the Court direct Meta to disclose to the government any information described in **Attachment B** that is within the possession, custody, or control of Meta.  I also request that the Court direct Meta to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of

the information described in **Attachment B** unobtrusively and with a minimum of interference with Meta's services.

Respectfully submitted,

RYAN BELCHER
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on _23rd_ March, 2023.

AMANDA MAXFIELD GREEN
United States Magistrate Judge

23

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the below listed Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Meta, Inc., a company headquartered in Menlo Park, California:

- **100040201699878**

# ATTACHMENT B

## Particular Things to be Seized

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Meta, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta, Inc. is required to disclose the following information to the government for user ID **100040201699878** from March 15, 2022, to December 15, 2022:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from March 15, 2022, to December15, 2022;

(c)     All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them from March 15, 2022, to December15, 2022, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with user ID **100040201699878**, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records of communications and messages made or received by the user of account **100040201699878** from March 15, 2022 to December15, 2022, including all private messages, chat history, video calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from March 15, 2022, to December 15, 2022;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. § 841 (Unlawful Possession with Intent to Distribute, Distribution and/or Manufacture of a Controlled Substance) and 21 U.S.C. §

846 (Drug Conspiracy) involving Facebook user IDs information pertaining to the

following matters:

> (a) Communication between user ID **100040201699878** and others pertaining
>
>    to the acquisition, purchase, movement, payment, location, and types of
>
>    illegal drugs being trafficked, including photographs, documents, and audio
>
>    files pertaining to such communications;
>
> (b) Evidence indicating how and when the Facebook account was accessed or
>
>    used, to determine the chronological and geographic context of account
>
>    access, use, and events relating to the crime under investigation and to the
>
>    Facebook account owner;
>
> (c) Evidence indicating the Facebook account owner's state of mind as it
>
>    relates to the crime under investigation;
>
> (d) The identity of the person(s) who created or used the user ID, including
>
>    records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications,

other records and information disclosed pursuant to this warrant in order to locate

evidence, fruits, and instrumentalities described in this warrant. The review of this

electronic data may be conducted by any government personnel assisting in the

investigation, who may include, in addition to law enforcement officers and agents,

attorneys for the government, attorney support staff, and technical experts. Pursuant to

this warrant, Homeland Security Investigations may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and

their support staff for their independent review